No. 25-1216

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

BILLIE JEROME ALLEN,

*Petitioner-Appellant,*

v.

S. MERENDINO,

*Respondent-Appellee.*

On Appeal from the United States District Court
for the Southern District of Indiana
No. 2:20-cv-00406-JRS-MJD, Hon. James R. Sweeney II

## ANSWER IN OPPOSITION TO APPELLEE'S MOTION FOR LEAVE TO TRANSFER PRISONER

Respondent-Appellee ("the government") has filed a motion requesting leave to transfer Appellant Billie Allen from USP Terre Haute to the supermax facility in Florence, Colorado, known as ADX. Mr. Allen opposes the motion because: 1) the government has not complied with Fed. R. App. P. 23(a) by showing a need for transfer; indeed, the government has not provided any reasons for the transfer; 2) the transfer is vindictive and in retaliation for the fact that Mr. Allen's death sentence was commuted by former President Biden—the government

is seeking to punish Appellant for having received a commutation to a life sentence; 3) Mr. Allen has a serious medical condition that requires frequent trips to the local hospital for blood transfusions, sometimes on an emergency basis; ADX does not have the same capacity for medical treatment as USP Terre Haute and may not be able to safely provide for Mr. Allen's medical needs; and 4) the substance of this appeal shows that Mr. Allen is being unconstitutionally held and never should have had a death sentence because he was never indicted on a capital offense. He should not be further punished for having had a death sentence that was illegal in the first place. Appellant explains these reasons in more detail below.

**A. Legal Standards**

The government seeks permission to transfer under Fed. R. App. 23(a), which provides:

> Pending review of a decision in a habeas corpus proceeding commenced before a court, justice or judge of the United States for the release of a prisoner, a person having custody of the prisoner shall not transfer custody to another unless such transfer is directed in accordance with the provisions of this rule. Upon application of a custodian showing a need therefor, the court, justice or judge rendering the decision may make an order authorizing transfer and providing for the substitution of the successor custodian as a party.

The plain language of the rule requires the government show "a need" for transfer. Although the Attorney General's determination of need is entitled to deference, the Attorney General must demonstrate a reason for transfer that is independent of the litigation and that is not retaliatory. *Ward v. U.S. Parole Comm'n*, 804 F.2d 64, 66

(7th Cir. 1986). There must be a legitimate reason for the transfer. *Id.* This is particularly so when the transfer will subject a habeas petitioner to more onerous conditions of confinement. *Wolf v. Clark*, 810 F. Supp. 2d 574, 586–87 (E.D. Va. 2011). Courts can consider whether the transfer is effectively punitive when the transfer will subject the prisoner to harsher conditions of confinement and limitations on his ability to receive family visits. *Id.* at 588.

**B. The Government Makes No Showing of Need.**

Here, the government's motion makes no showing of need, nor does it provide any reason for transfer, let alone a legitimate one. Thus the government has failed to comply with Rule 23(a), and its motion should be denied for that reason alone.

The government does cite to two cases where a motion to transfer was granted by this Court. *See* Order, *Agofsky v. Baysore*, No. 24-1067 (7th Cir. Sep. 19, 2025), Dkt. No. 59; Order, *Robinson v. Merendino*, No. 24-3040 (7th Cir. Oct. 2, 2025), Dkt. No. 9. Neither of these cases is applicable here. Mr. Agofsky did not object to the transfer, and Mr. Robinson's objection was noted in the government's motion, but he did not file any answer explaining the reasons for his opposition, as Mr. Allen does here. In any event, Mr. Robinson is a party to the litigation opposing transfer described below and, to the best of Appellant's knowledge, despite this Court's order allowing transfer, has not yet been transferred to ADX.

**C. The Request for Transfer Is Retaliatory and Seeks to Punish Mr. Allen for President Biden's Commutation of His Death Sentence.**

Mr. Allen is one of thirty-seven federal inmates whose death sentences were commuted to life without parole. In response to those commutations, the Bureau of Prisons ("BOP") and the Attorney General are seeking to transfer all thirty-seven inmates to ADX, subjecting them to the harshest conditions possible in retaliation for that commutation, and to punish the inmates for having their death sentences removed.

A group of inmates that does not include Mr. Allen has filed suit in the United States District Court for the District of Columbia raising numerous constitutional and statutory challenges to the wholesale transfers. *Taylor v. Trump*, No 1:25-cv-03742 (D.D.C.). Document 1 is the amended complaint ("Complaint"), which details the factual background of the government's effort to transfer the thirty-seven formerly death-sentenced inmates to ADX.[1] In the interest of expediency, Appellant relies on the factual assertions and supporting exhibits referenced in the Complaint.

The Complaint alleges that, following an executive order concerning the commutations issued by the President, Attorney General Bondi issued a

---

[1] Document 1 is a publicly available redacted version of the Complaint. The redactions appear to refer to specific detail about the medical conditions of individual plaintiffs, which are kept private. The government may have access to a non-redacted version of the Complaint.

memorandum calling on the BOP to transfer all death row commutees to ADX. The Bondi memo called for the BOP to abandon its prior procedures for the redesignation of inmates (a procedure that would have required an individualized determination that considered the inmate's behavioral history, medical condition, etc.) and adopt a new procedure that predetermined that the commutees would be transferred to ADX simply because of their status as commutees. Compl. paras. 5–9, 48.[2]

The Complaint further details that conditions at ADX are the most onerous and restrictive in the federal system. Located in a remote area that makes it difficult for counsel and families to visit, inmates at ADX are subject to extensive isolation and solitary confinement. Compl. paras. 115–32. The Complaint further describes the potential impact on mental and physical health as a result of the extreme isolation and solitary confinement faced by people sent to ADX. *Id.*

In short, the government's request to transfer Mr. Allen to ADX is not supported by any legitimate need but is intended to punish Mr. Allen for having his death sentence commuted, as a matter of policy dictated by the President and adopted by the Attorney General. The government has made no showing that Mr. Allen is a behavioral risk, that he has any record of violence since his

---

[2] The Complaint details the changes in BOP policies and practices following the Bondi memorandum.

incarceration, or that he poses any kind of security risk that could not be accommodated at any other USP or medical facility. The sole purpose of the transfer is vindictive punishment. For this reason as well, the request for transfer should be denied.

**D. ADX Is Not Equipped to Provide the Medical Care Mr. Allen Needs.**

BOP designates its prisons based on the level of medical care the institution can provide. ADX is designated as a Care Level 2 facility. USP Terre Haute, where Mr. Allen is currently housed, can provide greater medical care and is designated as a Care Level 3 facility. The Complaint explains that "'Institution Care Levels are based primarily on the clinical capabilities and resources of the institution and the surrounding community, as well as specific missions, e.g. dialysis, oncology, etc.'" Compl. para. 55. Care Level 2 is designed for people whose medical needs can be managed with regular appointments. Care Level 2 cannot provide care and treatment for people like Mr. Allen who have serious medical conditions. Compl. paras. 54–61.

Billie Allen has serious and chronic medical conditions that the medical staff at USP Terre Haute has struggled to treat. Even with the higher institutional level of care, Mr. Allen has required frequent hospitalization at outside facilities, at times on an emergency basis. Terre Haute could accommodate those emergencies

because the hospital is within a fifteen-minute drive from the prison. ADX cannot, because the hospital is over an hour's drive from the prison.

Federal authorities first became aware of Mr. Allen's medical needs during a visit to St. Louis, Missouri, for a court hearing, when Mr. Allen experienced alarming episodes of bleeding and was rushed to Barnes Jewish Hospital. There, doctors diagnosed him with Carcinoid Syndrome, an uncommon and unpredictable form of cancer. Additionally, they discovered a mass in his lower bowels, which was causing severe anemia and significant blood loss.

With age and time, Mr. Allen's health continues to deteriorate, particularly with his anemia, which doctors have diagnosed as a Dieulafoy lesion. It is a condition that is difficult to treat under the best circumstances, but even more so in the confines of a supermax prison. This lesion is a vascular malformation that will at times bleed profusely in the absence of an abnormality. When episodes occur, it becomes necessary to transport Mr. Allen to the hospital for treatment, complicating efforts to identify and address the source of bleeding.

These episodes often begin with severe nausea and discomfort in his lower stomach, escalating rapidly to intense cramping and sharp, stabbing pain. Mr. Allen's heart rate skyrockets, sometimes exceeding 130 to 160 beats per minute, as his body struggles with severe blood loss. This leads to dangerously low blood pressure, dropping as low as 55/44 while he waits for transport to the hospital.

In some instances, his condition has deteriorated to the point of unconsciousness, necessitating emergency room visits or ICU transfers. Treatment in the hospital typically involves receiving fluids to combat dehydration, pain medication for relief, and infusions of essential nutrients such as potassium, magnesium, or iron to replenish what his body has lost during these episodes.

Mr. Allen's medical crises have become increasingly dire due to frequent episodes of severe blood loss, resulting in a dangerously low blood count of five to six pints—far below the twelve to fourteen pints required for normal bodily function. Each episode requires two to four pints of blood for stabilization and an additional four to six pints to reach a healthy level. However, repeated transfusions have led to allergic reactions, complicating the process of finding suitable donors and prolonging Mr. Allen's suffering. These episodes occur regularly over several months each year, stretching back over a decade. And just last week, Mr. Allen was approved to be seen at a cardiology clinic for a work-up.

Care Level 2 facilities like ADX are not equipped to effectively treat and manage serious medical conditions such as those affecting Mr. Allen. Thus, transfer to ADX poses a risk of great pain, suffering, or even worse consequences. This Court should not allow the government to place Mr. Allen at risk, especially when there is no good reason to do so.

**E. Mr. Allen Should Not Be Subject to Further Punishment When His Incarceration Is Already Unconstitutional.**

The pending appeal demonstrates the unconstitutionality of Mr. Allen's incarceration. As explained in his memorandum opposing summary affirmance, Mr. Allen was tried and convicted on capital charges even though he was never indicted for capital murder. On direct appeal, the Eighth Circuit and the government conceded that Mr. Allen's Fifth Amendment rights had been violated. Nevertheless, the Court upheld his conviction and death sentence by using harmless-error doctrine to unconstitutionally constructively amend his indictment, based solely on its own speculation about what the grand jury would have done if it had been asked to consider a capital charge. *See United States v. Allen*, 406 F.3d 940, 942, 949 (8th Cir. 2005) (en banc).

Without a proper indictment, the government never should have been allowed to pursue the death penalty in the first place. Mr. Allen's death sentence was unconstitutional from its inception. The commutation did nothing more than partially correct the initial errors that, as Mr. Allen has asserted in the pending appeal, require a new trial. Under these circumstances, it violates due process and constitutes cruel and unusual punishment to further punish him for receiving a commutation of a death sentence he never should have had.

Mr. Allen has already asked this Court to promptly resolve the issue of summary affirmance and expeditiously move this appeal forward. The government

will suffer no prejudice if transfer is denied pending resolution of this appeal. The motion to transfer should be denied.

WHEREFORE, the motion to transfer should be denied. Should the government contest any of the factual issues raised in this response, or should this Court believe that additional factual development is necessary, this Court should remand this case to the district court to conduct an evidentiary hearing.

Respectfully submitted,

/s/ *Stuart Lev*
Stuart Lev
Eric Montroy
Assistant Federal Defenders
Federal Community Defender Office
Eastern District of Pennsylvania
601 Walnut Street, Suite 545 West
Philadelphia, PA 19106
215-928-0520

*Counsel for Petitioner-Appellant*
*Billie Jerome Allen*

Dated: November 12, 2025

# CERTIFICATE OF COMPLIANCE

This Answer contains 2086 words and complies with the typeface requirements of Fed. R. App. P. 32(a)(5), the type style requirements of Fed. R. App. P. 32(a)(6), and Seventh Circuit Rule 32(b), because it has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman.

/s/ *Stuart Lev*
Stuart Lev

Dated: November 12, 2025

# CERTIFICATE OF SERVICE

I, Stuart Lev, hereby certify that, on this date, I electronically filed the foregoing brief with the Clerk of Court for the Seventh Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ *Stuart Lev*
Stuart Lev

Dated: November 12, 2025